May it please the Court, Counsel, my name is Dawn Wall and I represent the Appellant Petitioner Jesse Pena, and we are here today on review of an industrial commission decision which affirmed a decision of the arbitrator. The arbitrator did award temporary total disability benefits in this case to Mr. Pena. The arbitrator found that he was entitled to temporary total disability from August 22, 2009 to November 3, 2009. Interestingly, she also found that he had sustained an incident that was a compensable incident. Mr. Pena worked for Autobahn. He was a laborer out of the Union Hall in Bloomington, and he had been working as a laborer to assist two brick masons. He testified at arbitration, and his testimony was consistent with the two employees that we also called as witnesses to indicate when he was working below the two brick masons, he was warned to step back out of the way because there was debris that was going to be falling. And as he made a step back, he stepped on the stick portion of a come along, which struck his elbow. Now Mr. Pena described the strike to his elbow as sounding like a hammer striking a nail. Very loud noise. He had immediate pain. Both of his co-employees indicated that he did indeed sustain that incident. He finished out the workday. He went home. He testified at about 3 o'clock in the morning. The pain became overwhelming in his left elbow, and he then showed up at work for a 5 a.m. call, worked until about 1 p.m. He remembers that very specifically because the Corn Festival was going on in Normal, and so they had a shortened workday. He did complete his workday and then went to see his primary treating physician, Dr. Spaniel. Dr. Spaniel diagnosed a contusion to the elbow, did x-rays, took Mr. Pena off of work. Mr. Pena saw him on Monday, August 24th. When Mr. Pena left the job site after his work injury on Friday, August 21st, his boss gave him a layoff slip and said that he would no longer be needed on this project, they were waiting on material, there was no more work for him with auto bomb, and he should report back to the union hall for his next assignment. That assertion that he was let go on that date would support the argument that the offer of employment of one day from core construction was not even an offer from an employer that he had any existing employer-employee relationship with. Also, Dr. Oakley testified in favor of the claimant, correct? That is correct, Judge, with respect to conditions that developed subsequent to the petitioner seeing Dr. Atluri. Dr. Atluri saw the petitioner one occasion, September 22nd, 2009. Dr. Oakley testified that with regard to the ulnar nerve symptoms and what he described as cubital tunnel compression, those were symptoms that he was treating him for in December. I'll try to gather an opinion that the claimant's symptoms of cubital tunnel syndrome, he believed, I mean, basically he found that there was no causal connection, correct? Dr. Atluri? Yes. Well, Dr. Atluri indicated that in his deposition testimony, but I would assert to your honors that this case is very similar to the Phillips case, where really Dr. Atluri did not offer any convincing causal connection opinion with regard to that developing condition. Let's stop right there and underscore the word convincing. Who determines if the testimony is convincing? The finder of fact will weigh that evidence and determine that. It would be the commission. I would agree. Arbitrator and then the commission can again re-weigh it. But in this instance, I believe we meet the manifest weight of the evidence because there is no evidence to substantiate the change in condition on November 3rd, which is when the arbitrator found that Mr. Pena's benefits were terminated. And I think the timeline in this case is extremely significant. I will give your honors that there is some evidence in the record regarding causal connection on the cubital tunnel syndrome. Well, that makes it distinguishable from Phillips, though, because in Phillips, only one physician offered direct opinion on causal connection, and that was in favor of the claimant. That's different here. This is distinguishable because you have a contrary opinion, albeit you believe it's weak and not convincing, on the other side. I guess I would assert that it's not even a credible opinion by Dr. Atluri. But again, who makes the determination? Well, I think this court can look at what is the information that the commission relied upon in determining what Dr. Atluri's opinion truly was. Dr. Atluri gave the opinion that in September of 2009, this individual had a contusion to his lateral epicondylitis and his left elbow contusion. Dr. Atluri then, at least on October 30th, felt that there was a significant enough condition that a CT scan should be done. Dr. Atluri ordered that CT scan on October 30th. He did not see the claimant in between. He also testified that the EMG study that Dr. Oki had suggested be performed, that there was a positive tenels. I think this case is unique in that Dr. Atluri renders opinion for the claimant and basically says yes. The mechanism of injury that he described to me and the subjective complaints that he presented with on September 22nd, 2009, those substantiate his condition of ill being. Counsel, let me ask you this. Did not Dr. Atluri note that when he examined the claimant on September 22nd, 2009, the claimant denied any symptoms related to cubital tunnel syndrome, such as numbness or tingling in his fingers? Is that accurate? At that point in time, on the constellation of time, September 22nd, 2009, that is accurate. Dr. Atluri never examined him again, but I believe it is worthy of note that Dr. Atluri noted that based on his review of Dr. Oki's progress notes from the November visit and the December visit, there clearly was a positive tenels. And Dr. Atluri even said in cross-examination, I don't know if that condition developed over time after I laid my hands on him. I think also, your honors, that it's significant in this case where the arbitrator cuts off TTD when we talk about the two conditions that this petitioner had. Clearly, Dr. Atluri says, yes, he had a contusion to the elbow. And on September 22nd, I was predicting eight to ten weeks of treatment necessary for that condition. Even if we assume for purposes of the argument that Dr. Atluri does cut off the condition as a consequence of the development of cubital tunnel syndrome, this gentleman was on restrictions by his physician, Dr. Keller, his physician, Dr. Oki, Dr. Spaniel, and Dr. Atluri. On the day that a case manager with CORE Construction, who's a risk management company for Autobomb, calls Mr. Pena and offers him a six-hour flagger job. I think that's a significant issue against manifest weight, separate and apart from the causal connection on the cubital tunnel syndrome. Why couldn't he do the job they offered? I'm sorry? Why couldn't he perform the job they offered? He was on restrictions by Dr. Spaniel and also by Dr. Keller. Why wasn't it within his restrictions? I would assert, Your Honor, his testimony was that he would not be able to do that flagger job with one hand. Well, but that's not what Mr. Mackey said. Right, but Mr. Mackey had never been licensed as a flagger. Mr. Mackey was motivated to assert an offer by an employer that had terminated Mr. Pena. So that's all you're doing. You're arguing credibility. That's the commission's job. They believe Mackey. They didn't believe your client. Well, but there has to be a basis in the medical evidence to even get beyond whether he could do that particular job. But the only difference was one-handed versus two-handed. That's the only difference. If he could do that job one-handed, they offered him a job within his restrictions. There was nothing else left. And he declined that job based on his understanding that his physician had him restricted. Also, there was... No, he declined the job because he said he needed two hands to do it. And Mackey said you only need one. Well, he also did indicate to Mr. Mackey that he was not refusing to work, but he was refusing that particular job because his physician had him completely off of work at that point in time. So Dr. Keller had him off of work October 22nd forward. If he refused the job within his restrictions, his T.T. gets cut off. Now, if they believe that he refused the job that fell within his restrictions, he gets no T.T.D. from that day on. Well, I would assert under mechanical devices, the Michael Johnson case, that particular individual with a back injury who could not work for the actual employer was working for the YMCA. And that work was deemed by the court to not be sustainable or stable. And Michael Johnson's condition had not reached the point where this court said, you know what, we can require him to go out and work and not receive T.T.D. benefits. I think Mr. Pena's situation was Dr. Keller had him completely off of work. He received a phone call from an employer who had previously fired him and said, we have a six-hour flagger job for you. Mr. Pena said, I don't want to be disrespectful. I don't want to refuse the job, but my doctor has me completely off of work. And at that point in time, Mr. Pena did not even know what Dr. Atluri's opinion was because Dr. Atluri did not admittedly even get his report to the claims adjuster until November 10th. That's why I think in this instance it's so significant the timing of these events. Counsel, let me ask you this. Obviously you're taking issue with Dr. Atluri's testimony. You testified that the mechanism of injury claimant described was not the type that would be reasonably expected to cause common extensor tendon tear. Didn't Dr. Keller concur with that specific finding, Dr. Keller noting that upon examination, the claimant demonstrated no tenderness or weakness in the common extensor origin? Didn't Dr. Keller himself concur with that? Dr. Keller concurred with that. Dr. Atluri and Dr. Keller also concurred that this gentleman sustained a contusion to the bone in his left elbow. And they treated him accordingly. Dr. Atluri concluded the contusion was related to the work injury. He did not believe any other findings were causally related to the accident. But Dr. Atluri didn't limit his testimony regarding what additional treatment the claimant needed during the period from September 22nd, 2009 through 8 to 10 weeks later, which would have put him past the November 2009. Let me ask you the critical question. If we were to find in favor of the claimant, how do you respond to the argument that we would simply be substituting our judgment for the commission's on the issue of credibility and weight to the evidence? What's your response to that? I would respond that I do not believe that this court is required to weigh any evidence on the first issue. If we assume for purposes of the argument that this petitioner had a contusion to the left elbow and we forego making considerations about the surgery that Dr. Oki recommended and the cubital tunnel syndrome, there is no disputed medical evidence that Mr. Pena was disabled on October 22nd, 2009 and needed additional treatment for his bone contusion. And that would be the thrust of my argument on that. When did Dr. Keller say he couldn't work at all? October 22nd, 2009, Your Honor. On October 22nd, 2009, my notes reveal that he ordered physical therapy, gave the claimant a release to return to light-duty work with restrictions of, quote, no pushing, pulling, or lifting with the left upper extremity. Now, are my notes wrong? Well, I know, Your Honor, in my brief and also in the respondent's brief, we both assert and put forward that October 22nd, 2009, Dr. Keller did indeed Well, I'm reading you a quote from his notes. Quote, no pushing, pulling, or lifting with the left upper extremity, close quote. There was then, Your Honor, a second work slip, not a progress note, given on that same day that did take him completely off of work on that particular day. So his progress notes say no pushing, pulling with the left arm. Now, what did Oakey say on December the 14th? He said that he was able to work within the restrictions but no work with his left arm, and that was in November and again in December. And then the issue is whether a six-hour job is a basis to terminate benefits for someone who's relying on their doctor's information. And Mr. Mackey said he didn't know how long that job was going to last. He couldn't say with any degree of certainty that that flagger job was any more than six hours. Is that a basis for turning it down? He doesn't know how long it's going to last? No, but I think that in this instance, the petitioner specifically did tell Mr. Mackey he was turning it down because his physicians had him off of work, and he didn't want to go against his doctor's restrictions, and Dr. Mackey indicated that. Counsel, your time is up. Thank you. Counsel, you may respond. Thank you, counsel, members of the appellate court. My name is Denny Nell. I represent Otto Baum and Sons. I do think this is a clear manifest way of the evidence case. I think it should be affirmed. I think there's sufficient evidence in the record to support the employer's position with respect to causation. Let me touch briefly on the Phillips case. I think if you read that case, and I've read it, and I'm sure you all have read it, it's totally factually distinguishable. There's absolutely no evidence in that case by the respondent or the employer to support their position on causation. If you look at Dr. Atluri's opinions, he basically says this gentleman had a contusion to the left elbow. He ruled out the common extensor tendon. He ruled out any cubital tunnel issues. The other thing I think is important, if you look at our brief on page 15, I think it's very important because I quote Dr. Oki's testimony from the record at pages 108 and 116. That deals with the causal connection issue with respect to Dr. Oki's opinions. I just want to read, and I'll quote this, because I asked him this question. I took his deposition. I tried this case. I asked him the following question. If I understand your testimony, it is not the acute trauma that he experienced on August 20th of 2009 that would have been the cause of the cubital tunnel findings that were made on December 14th of 2009. Is that correct? He says that is correct. Oki is saying that the cubital tunnel problem is not as a result of the acute trauma. In addition to that, Laurie. In addition to that, Laurie. Correct. So it's not just that, Laurie. Yeah, it's not just that, Laurie. I don't know if it's quite that clear. Oki testified that the cubital tunnel findings were as a result of his use of the left arm as a result of the tendon's elbow diagnosis that it could or might have irritated the ulnar nerve. So Oki wasn't so clear as saying it has nothing to do with it. No, but you've got to put it in context. And I agree with what you're saying because he's talking about the fact that it's the use of the arm. But you've got to understand that he didn't say it was just not a repetitive trauma case. And it's not a theory where he developed that cubital tunnel over a period of time before August 20th of 2009 that it manifested itself on August 20th of 2009. And if he's saying that he developed that cubital tunnel syndrome as a result of the repetitive use of his left elbow after August 20th of 2009, he didn't work after August 20th of 2009 to even try to relate it back to some type of work activity. So I appreciate your statement is absolutely correct. But if we assume that August 20th was when he sustained the acute trauma, then if as a result of the acute trauma he had to use his left arm constantly and that would have irritated and caused the cubital tunnel, that's recoverable. So Okie isn't giving you a clear right. No, I'm not saying it's black and white, but I think you've got, you know, and the record is clear, the gentleman did not work, you know, after. He wouldn't have to work. If he had to use the one arm and only the one arm no matter what he used it for, and if it was a result of the original work injury, it's recoverable. Well, I understand where you're coming from. I just think that that's a little bit of a red herring in the sense that Okie says, you know, we're dealing with a specific date of loss of August 20th of 2009. And even if you assume that's true what you're telling me, and, you know, there's no question about Okie's testimony to that effect, Justice Hoffman, you still have all of the other testimony from the other positions. Oh, there's no question about that. And so we get into a manifesto. I only pose the question because you seem to suggest that Okie was agreeing with you that this, the event of August 20th, 2009, had nothing to do with the cubital tunnel. That's not true. Well, I guess it's, you know, I think it's clear he said it's not as a result of the acute trauma. I think it's clear based on that. Yes. And then he does. He said more. He did say more. I'm not suggesting that what you're telling me is incorrect based on the record. I'm just saying that if you look at that continued use of the left arm, there's no evidence in the record to substantiate the petitioner's lay testimony concerning the use of his left arm after the accident. It's clear he didn't use it at work because he didn't work. So I understand I don't disagree with the statements that you've made in all due respect. I just think it's a matter of interpretation. It's not black and white. It's black and white on the acute trauma issue. It's more gray with respect to the repetitive aspect of it. In any event, you get back. I still think it's a manifest way of the evidence question. When you look at it, taking into consideration the Phillips case, I think to me it's a question of we cannot substitute. Even though, and the court has stated this many times, and I've had cases before you on both sides on manifest way of the issues, and I think that's what this case is. And I think it should be affirmed. Whether Dawn disagrees, which she does, or you disagree, you might have found some facts different, there's evidence in the record to support this decision, and I would ask that you affirm it. Thank you. Thank you, counsel. Ms. Wall, you may reply. Very briefly, Your Honor. With regard to specifically Dr. Oki's testimony, if you read further in his deposition from what counsel indicated to you, he actually does indicate that it was not the acute episode on August 20th that caused the condition that he suggested the claimant needed an EMG for to rule in or rule out the degree of compression. But he did say that the treatment modalities and the actual treatment as a consequence of the August 20th incident did lead to the need to further explore that. I, as Mr. Nell, have had many, many cases before Your Honors where it is manifest weight. And certainly I'm not trying to argue that the test is any different in this particular case. But I do believe that there's a unique issue with respect to the consideration that was given by the commission on the termination of Mr. Pena's TDD. Clearly, the decision of the commission in this case requires claimants to follow whatever the IME doctor suggests, whether they know about it or not. The employer simply called Mr. Pena and said, we have a six-hour job, even though we laid you off, and you are required to come and do that flagger job. And if you don't, we're going to terminate your benefits. That gives the petitioner no right of recourse under the facts in this case. And I do think that that is a legal issue that this court can consider in light of the Schmidgall factors and the fact that he had not, in anybody's opinion, reached maximum medical improvement, and even his contusion had not reached maximum medical improvement under Dr. Avallori's opinion. Thank you, Your Honors. Thank you, counsel. This matter has been taken under advisement. Written disposition shall issue. The court will stand in brief recess for panel change.